Filed 2/23/24  P. v. Buggs CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMON RAYON BUGGS,<br><br>    Defendant and Appellant. | G061456<br><br>(Super. Ct. No. 19HF0550)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge.  Affirmed.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

Jamon Rayon Buggs appeals from a judgment after a jury convicted him of, among other things, two counts of first degree murder. Relying on the California Racial Justice Act of 2020 (RJA) (Pen. Code,[1] § 745), Buggs argues the trial court erred by finding that Orange County District Attorney (OCDA) Todd Spitzer violated the RJA but then not imposing its own remedy after Spitzer decided not to pursue the death penalty. We disagree and affirm the judgment.

FACTS

*I. Substantive Facts*

Buggs does not challenge the sufficiency of the evidence to support his convictions.[2] Under established appellate principles, we recite the facts in the light most favorable to the judgment. (*People v. Banks* (2015) 61 Cal.4th 788, 795.)

S.B., a traveling nurse, moved from Minnesota to Murrieta, California. She exercised at a gym and hired Buggs as her personal trainer. They began dating.

Several months later, Buggs got a job at a gym in Huntington Beach. S.B. and Buggs moved into an apartment nearby. S.B. got a full-time nursing job. Their relationship was healthy until they began having financial difficulties. About eight months later, Buggs hit S.B., and she moved out. They had an on-again, off-again relationship for about seven months until S.B. decided to end it. S.B. eventually obtained a restraining order against Buggs.

In January 2019, S.B. started dating J.Y. S.B. told Buggs that she was dating someone and their relationship was over.

About a month later, S.B. met Darren Partch at a gym. During their conversation, S.B. told him about a business idea, and Partch said he could help. They

---

[1] All further statutory references are to the Penal Code.

[2] At trial, Buggs's counsel admitted Buggs killed the victims but argued it was in the heat of passion.

exchanged social media account information to continue that conversation. S.B. never saw Partch again, and they did not have a dating relationship.

Although S.B.'s restraining order against Buggs was active, she saw him on two occasions in March 2019. On the first occasion, she went to his apartment and spent the night. A couple weeks later, she went to the automobile dealership where he worked because he said he could get her a deal; he didn't. In March and April 2019, Buggs performed extensive internet searches for S.B.'s contact information.

On March 17, 2019, Partch and his roommate were home. Partch answered a call on his cell phone using the speaker function. The caller, Buggs, asked if the man was Partch. Partch asked, "Who is this?" Buggs angrily told Partch to stay away from his girlfriend, S.B. Partch asked Buggs what he was talking about. Buggs said it would be bad for Partch if he did not stay away from his girlfriend and hung up. Partch looked through his phone and found his communications with S.B. Partch texted S.B. and told her he was afraid and would have no further contact with her.

On March 25, 2019, S.B. sent Buggs an e-mail asking him to leave her alone. That same day, Buggs drove to J.Y.'s office. Buggs asked J.Y. where S.B. lived, what her cell phone number was, and if he was having sex with her. Buggs said he would not be happy if J.Y. was having sex with S.B. and it was in his best interests to answer the questions. J.Y. told Buggs it was none of his concern and he was going to call the police. When J.Y. used his cell phone to record Buggs, he left.

A couple weeks later, Buggs searched the internet for J.Y.'s address. A person with the same name, but who was not S.B.'s boyfriend, lived at an address in Irvine (Irvine residence). From around April 12 through April 20, 2019, Buggs repeatedly searched the internet to locate S.B. and Partch.

Surveillance cameras showed a man walking in the condominium complex where Partch previously lived. Location evidence placed Buggs's cell phone in that area during the relevant time. Buggs's cell phone records placed him at or near Partch's

3

current residence in the days leading to the murders. Around the same time, S.B. saw Buggs driving behind her vehicle, but she was able to evade him.

On April 19, 2019, Partch met Wendi Miller at a nightclub. Miller left with Partch. When they got to Partch's residence, Miller texted a friend to say she had arrived safely. Buggs's cell phone records placed him near Partch's residence 50 minutes later. Sometime early that morning, Buggs entered Partch's residence and fatally shot Partch and Miller in the head. When the roommate returned home late the next evening, he discovered Partch and Wilson and called 911.

Late on the night after Buggs murdered Partch and Miller, N.C. was sitting on the couch in her second-floor living room in the Irvine residence; there was a balcony. Remember, a person named J.Y. but who was not S.B.'s boyfriend lived here. N.C. heard a thump on the balcony and saw a Black male. N.C. ran to the sliding glass door, held it closed, and yelled for her husband and son to call the police. As the man started to climb down from the balcony, he fired a gunshot and fled. Police arrived.

Days later, police officers arrested Buggs after a car chase and seized his cell phone. In his car, officers found Partch's phone number and address. During an audiotaped interview, Buggs admitted he was at N.C.'s residence and accidently fired the gun.

Ballistics and DNA evidence established Buggs had used a revolver to fire all of the bullets. Evidence established the bullet fired at N.C.'s residence was fired from the same revolver as the bullets related to Partch's and Miller's murders.

## II. Procedural Facts

An information charged Buggs with the following: two counts of murder (§ 187, subd. (a), counts 1 & 2); attempted first degree burglary (§§ 459, 460, subd. (a), 664, subd. (a), count 3); and possession of a firearm by a felon (§ 29800, subd. (a)(1), count 4). As to counts 1 and 2, the information alleged Buggs committed multiple murders (§ 190.2, subd. (a)(3)) and personally discharged a firearm causing death

4

(§ 12022.53, subd. (d)). It also alleged he had suffered a prior strike conviction (§§ 667, subds. (d), (e)(1), 1170.12, subds. (b), (c)(1)).[3]

On October 1, 2021, the OCDA had a Special Circumstances Committee (SCC) meeting to discuss whether to pursue the death penalty against Buggs. On December 3, 2021, Ebrahim Baytieh, then an OCDA senior assistant district attorney,[4] wrote a memorandum about the meeting. Baytieh explained that while they were discussing Buggs's prior acts of domestic violence as an aggravating factor, Spitzer asked about the race of Buggs's victims and prior girlfriends. Baytieh stated he told Spitzer that race was an inappropriate consideration. Spitzer said he disagreed and that he "kn[ew] many [B]lack people who get themselves out of their bad circumstances and bad situations by only dating '[W]hite women.'" Baytieh recounted that he repeated the committee should not consider race and doing so could implicate the RJA. Spitzer said that when he was in college he knew a Black student who only dated White women and he "knew for sure that this [B]lack student did so on purpose to get himself out of his bad circumstances and situations."

On January 21, 2022, Baytieh wrote Spitzer an e-mail stating that at Spitzer's request, Baytieh agreed to revise his memorandum. He would replace the language concerning "get . . . out of . . . bad circumstances" with "enhance [their/his] status." A week later, the OCDA notified Buggs that Spitzer would not seek the death penalty.

Two days later, Spitzer wrote Baytieh a memorandum. Spitzer admitted he said that he had "seen Black men date White women in certain circles in order to have others around them be more accepting." Spitzer added that he said Larry Elder served as a potential example of such societal behavior because had been embraced by "the

---

[3]     At trial, the parties stipulated Buggs had suffered a prior felony conviction.

[4]     Baytieh is now a judge on the Orange County Superior Court.

mainstream conservative White political community." Spitzer stated he was concerned about cross-racial identification—whether Buggs could identify the blond-haired White woman he killed, Miller, as opposed to his White and blond-haired former girlfriend, S.B., in a dark room. He reasoned it was relevant to the issue of whether Buggs killed with premeditation or in the heat of passion. Spitzer recounted the measures he took to cure any harm. He assigned the case to an experienced homicide prosecutor who had no knowledge of what transpired at the SCC meeting. He "walled off" everyone involved with the SCC meeting from the prosecution. He decided to not seek the death penalty. He noted this was a remedy in the RJA. (§ 745, subd. (e)(3).) Spitzer "adamantly den[ied]" he violated the RJA.

The prosecution filed a motion for in camera review of privileged work product. After a hearing and Buggs filed briefing, the prosecution withdrew its claim of privilege and released the relevant documents to Buggs. At a hearing on Buggs's request for additional discovery, Buggs's counsel discussed potential remedies for violation of the RJA. The trial court stated these issues could be litigated posttrial. Later, the trial court considered Buggs's motion pursuant to *People v. Marsden* (1970) 2 Cal.3d 118.

During trial, Buggs filed a nonstatutory motion to dismiss pursuant to the RJA. Buggs argued Spitzer's comments violated the RJA and requested the court dismiss the case or enhancements or reduce the charges. The prosecution filed an opposition contending Spitzer had not violated the RJA because his question appropriately reflected a valid concern about Buggs's state of mind. Alternatively, the prosecution asserted Buggs already received the appropriate remedy because Spitzer would not seek the death penalty.

The jury convicted Buggs of all counts and found true all the enhancements. Later, Buggs filed a motion to find a violation of the RJA and to grant appropriate relief.

6

At the sentencing hearing, the trial court found true that Buggs had suffered the prior felony conviction. As to the RJA motion, the court noted it was considering all of the prior pleadings related to the RJA and the discovery and trial exhibits. Buggs's counsel argued Spitzer's statements established a prima facie violation of the RJA. The prosecutor contended the OCDA did not take any action against Buggs based on his race and thus it did not violate the RJA. He added Spitzer's comment went to Buggs's intent, i.e., his mistaken belief Miller was S.B., which "as it turned out" was Buggs's defense. He added that the decision to not seek the death penalty, "which was influenced in large part by the CTE information that defense counsel provided, has kind of made this particular issue moot."[5] On the court's invitation, the parties offered additional argument on whether it was in the interest of justice to reduce charges, or dismiss special circumstances or allegations (§ 745, subd. (e)(1)(C)).

The trial court concluded it was not in the interests of justice to reduce charges or dismiss the enhancements or the special circumstances because the prosecution did not "overreach[]." The court opined that "[t]he evidence . . . in this case was compelling," the "[e]vidence of motive was overwhelming," and "[t]he evidence of identity was almost beyond dispute." The court stated, "The impact of the violation goes directly towards the death penalty."

Buggs's counsel requested the trial court clarify whether it was finding that the OCDA violated the RJA. The court said, "Yes." Counsel asked for clarification regarding the remedy. The court stated the appropriate remedy had already been provided.

---

[5] Chronic traumatic encephalopathy (CTE) is a brain condition thought to be linked to repeated head injuries and blows to the head. Buggs played football from the age of seven through junior college.

The trial court sentenced Buggs to prison for four years on count 3; it imposed and stayed the term on count 4 (§ 654). On counts 1 and 2, the court sentenced him to two consecutive terms of life without the possibility of parole plus 25 years to life.

DISCUSSION

The RJA provides, "The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) The statute provides four categories of conduct that establish a violation if proved by a preponderance of the evidence. (§ 745, subds. (a), (c)(2).) The first category of conduct provides, "The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (§ 745, subds. (a)(1), (h)(4) [defines racially discriminatory language].) One of the categories concerns discriminatory language or conduct *during trial* (§ 745, subd. (a)(2)), one discriminatory treatment in the *offense* (§ 745, subd. (a)(3)), and one discriminatory treatment in the *sentence* (§ 745, subd. (a)(4)).

The RJA requires a trial judge to impose a remedy if a violation occurred. Section 745, subdivision (e), states, "[T]he court *shall* impose a remedy specific to the violation found." (Italics added.) The statute specifies remedies based on whether judgment has been imposed. (§ 745, subds. (e)(1) [before judgment, declare mistrial or discharge jury and empanel new jury], (e)(2) [after judgment, reduce offense or impose new sentence].)

The statute also authorizes a trial court to "dismiss enhancements, special circumstances, or special allegations, or reduce one or more charges" in the interests of justice. (§ 745, subd. (e)(1)(C).) Additionally, if there was a violation, the defendant is not eligible for the death penalty. (§ 745, subd. (e)(3).) Finally, the court may impose "other remedies available under the United States Constitution, the California Constitution, or any other law." (§ 745, subd. (e)(4).)

8

Buggs first complains the trial court did not make the required findings concerning the type of RJA violation. (§ 745, subds. (c)(3), (e).) A violation of section 745, subdivision (a)(1), is the only category implicated by the facts and procedural posture of the case. That is the only violation Buggs argued below—Spitzer exhibited bias toward him based on Spitzer's comments at the SCC meeting. This is what counsel and the trial court were singularly focused on during the section 745 discussion. Indeed, Buggs acknowledges the OCDA "most likely" violated subdivision (a)(1). We agree with Buggs that subdivision (a)(1) is the only provision the OCDA could have violated. We need not weigh in on the issue of whether the OCDA violated the RJA because the Attorney General concedes the point.

The sole issue before us is whether after the OCDA decided to not pursue the death penalty, was the trial court *itself* required to impose an additional remedy. (§ 745, subd. (e) ["the court *shall* impose a remedy specific to the violation found" (italics added)].) We are not concerned here with Buggs's right to a speedy trial, any discovery disputes, his *Marsden* motion, or the unavailability of any plea offers because the OCDA "walled off" the prosecutors at the SCC meeting.

"'Discrimination in our criminal justice system based on race, ethnicity, or national origin . . . has a deleterious effect not only on individual criminal defendants but on our system of justice as a whole. . . . Discrimination undermines public confidence in the fairness of the state's system of justice and deprives Californians of equal justice under law.' [Citations.] The Legislature found that, while racial bias is 'widely acknowledged as intolerable in the criminal justice system,' it persists because 'courts generally only address racial bias in its most extreme and blatant forms.' [Citation.] In its view, current law 'is insufficient to address discrimination in our justice system. [Citations.] Even when racism clearly infects a criminal proceeding, under current legal precedent, proof of purposeful discrimination is often required, but nearly impossible to establish.' [Citation.]" (*People v. Simmons* (2023) 96 Cal.App.5th 323, 332-333.)

9

The Legislature declared its intent "to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under [a]rticle VI of the California Constitution, and violates the laws and Constitution of the State of California." (Stats. 2020, ch. 317, § 2, subd. (i).) The legislative findings note it is not the Legislature's intent to punish explicit or implicit racial bias, "but rather to remedy the harm to the defendant's case and to the integrity of the judicial system." (*Ibid.*)

We address Spitzer's actions despite him adamantly denying he violated the RJA. His actions suggest he actually understood his transgression. Spitzer admitted he took measures to cure any harm. He assigned the case to an experienced homicide prosecutor who had no knowledge of what transpired at the SCC meeting. He "walled off" everyone involved with the SCC meeting from the prosecution. Most significantly, he decided to not seek the death penalty and noted this was a remedy in the RJA. (§ 745, subd. (e)(3).)

Despite Spitzer's reluctance to acknowledge his expressed racial bias, he took steps to remedy the harm to Buggs's case and to the integrity of the prosecution. The trial court clearly understood Spitzer took the steps necessary to prevent racism from infecting the criminal proceeding and nothing further was required under the statute. Based on the unique facts of this case, the trial court did not err by concluding the appropriate remedy was that Buggs was no longer subject to the death penalty. The plain language of section 745, subdivision (e), requires "a remedy specific to the violation found." The record before us demonstrates the court found Spitzer violated the RJA when he made racially discriminatory statements during the SCC meeting when considering whether to pursue the death penalty. The appropriate remedy, no death penalty, was specific to the violation the trial court found. On this record, Buggs has not established there was a miscarriage of justice (Cal. Const. art. VI, § 13).

10

Buggs faults the trial court for imposing an "'overreaching'" requirement into the RJA and asserts it "eviscerate[d]" the RJA's purpose by creating a "'no harm no foul' escape clause." Buggs makes too much of the court's comment. The statute authorizes a trial court to "dismiss enhancements, special circumstances, or special allegations, or reduce one or more charges" in the interests of justice. (§ 745, subd. (e)(1)(C).) In his moving papers, Buggs requested the court consider "section (c) [*sic*]" remedies. The court opined the prosecution did not overreach while explaining why it was not in the interests of justice to dismiss the enhancements or special circumstances or reduce the charges. The court was merely noting "overreach" was one of the ways to demonstrate Spitzer's statements infected the proceedings.

Buggs's complaint that the trial court's decision to consider his section 745 motion after trial misses the mark. Buggs does not make the case the prosecution sought or obtained a conviction or sentence in violation of the RJA. Additionally, Spitzer's comments were not before the jury and thus a mistrial or empaneling a new jury were not appropriate remedies.

Finally, Buggs claims the trial court could have imposed another remedy, such as granting a new trial, dismissal, or imposing concurrent sentences. (§ 745, subd. (e)(4) [other remedies under other laws available].) Buggs did not seek these remedies at trial and thus forfeited his contentions. (*People v. Braxton* (2004) 34 Cal.4th 798, 814 [failure to press for hearing on a new trial motion forfeits appellate claim]; *People v. Scott* (1994) 9 Cal.4th 331, 353 [failure to object to trial court's discretionary sentencing choices forfeits appellate claims].) But as discussed, no additional remedy was necessary.

Given the intent of the RJA to eliminate racial bias from California's justice system, it would seem counterproductive to fail to acknowledge remedial actions taken by a district attorney, prior to any intervention by the court, to eliminate any aspect of racial bias arising from the prosecution. The unintended consequence of ignoring the

11

actions of the prosecution may be to encourage the prosecution not to self-correct but rather wait to see what the court may do.  Instead, we want to encourage the prosecution to avoid instances of racial bias and when discovered to immediately and appropriately address the issue.  But for the somewhat unusual revelation of internal OCDA correspondence and Spitzer's actions, this conversation may never have come to the trial court's attention.

## DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


SANCHEZ, J.


MOTOIKE, J.